IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DR. JOYCE BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:09-cv-0927 |
| | ) | |
| ALAN NABORS,[1] JOHN LIEHR, KEVIN KRIEB, | ) | Judge Thomas A. Wiseman, Jr. |
| MARCY GOSSETT, JOHN DOE #1, and | ) | |
| JOHN DOE #2, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff Dr. Joyce Brown filed this action in October 2009 asserting claims under 42 U.S.C. §
1983 against Defendants Allan Nabours, John Liehr, Kevin Krieb, Marcy Gossett, John Doe #1 and John
Doe #2, in their official and individual capacities, for allegedly violating Plaintiff's rights under the Fourth
and Fourteenth Amendments to the United States Constitution. Plaintiff also asserts state-law claims for
malicious prosecution and false arrest, malicious abuse of process, intentional infliction of emotional
distress, tortious interference with business relationships, and civil conspiracy. Defendants are all police
officers employed by the Smyrna Police Department in Smyrna, Tennessee. Plaintiff's claims are based
on her arrest on February 18, 2009 for suspicion of driving under the influence ("DUI"), and on an
unrelated investigation of Plaintiff's prescribing practices.

Each of the six defendants, including the John Doe defendants, have now filed, or had filed on
their behalf, a separate "Motion to Dismiss for Failure to State a Claim, or, Alternatively, Motion for
Summary Judgment" (ECF Nos. 34, 35, 36, 37, 38, 39), and one omnibus Memorandum of Law in
support of the individual motions (ECF No. 40). The motions have now been fully briefed and are ripe for
consideration.

## I. STATEMENT OF FACTS

Plaintiff is an African-American woman who resides in Antioch, Tennessee. She is by training an
osteopathic physician specializing in pain management. She is registered with the federal Drug

---

[1] The correct spelling of this individual's name is apparently Allan Nabours, not Alan Nabors.

Enforcement Agency to write prescriptions for every class of medications and narcotics.

Defendants Marcy Gossett, Allan Nabours, John Liehr, and Kevin Krieb (collectively, "Defendants" or the "Named Defendants") are all law enforcement officers employed by the Town of Smyrna, Tennessee. The Named Defendants have been continuously employed by the Town of Smyrna at all times relevant to this dispute.

Plaintiff's claims arise from a minor traffic accident that occurred in February 2009, which led to Plaintiff's arrest by Defendant Gossett for driving under the influence of narcotics ("DUI"), and from an apparently unrelated investigation by the Smyrna Police Department ("SPD") into Plaintiff's prescribing practices, which began in October or November 2008. The basic facts relating to each of these events are set forth below. The facts are undisputed for purposes of the motions for summary judgment unless otherwise indicated.[2]

### A.    The DUI Arrest

On the evening of February 18, 2009, Plaintiff was involved in a minor traffic accident with Carolynn Abraham, who rear-ended Plaintiff's vehicle on Sam Ridley Parkway. The accident, for which Abraham was admittedly at fault, did not cause physical damage to either vehicle or injury to either driver. According to her affidavit testimony, Abraham tried to speak with Plaintiff while Plaintiff was still sitting in the driver's seat of her vehicle, but Plaintiff initially refused to lower her window in response to Abraham's overture. At this time, Abraham observed that Plaintiff was eating or placing something in her mouth that she was retrieving from the console of her car, and continued to eat "frequently" during the thirty to forty-five minutes that Abraham was at the scene. According to Abraham, Plaintiff was unreasonably verbally aggressive toward her despite Abraham's immediate admission of fault for the accident, and Plaintiff appeared jittery and evasive throughout the time that Abraham remained at the site of the accident. Based on her observations of Plaintiff's behavior, Abraham told Officer Marcy Gossett, the first SPD

---

[2] Plaintiff argues in her response brief that "the Court should reject this combined Motion in its entirety for Defendants' failure to cite to the record to support any factual assertion in the brief supporting this combined Motion." (ECF No. 46-3, at 2.) The facts set forth herein are drawn from Plaintiff's responses to Defendants' Statement of Undisputed Material Facts and the factual record itself. Because Defendants cited appropriately to the record in their Statement of Undisputed Material Facts and in their response to Plaintiff's statement of additional facts as to which she contends there is a material dispute, in compliance with the Local Rules, the fact that Defendants did not cite to the evidentiary record in their actual brief is not material.

Officer to arrive at the scene of the accident, that Plaintiff appeared to be under the influence of drugs.[3] (Abraham Aff. (ECF No. 42-5) at ¶¶ 6–11.)

David Clark, a deputy sheriff employed by Rutherford County who is not a defendant in this suit, was actually the first law enforcement officer to arrive at the scene of the accident. As of February 2009, Clark had eleven years of experience as a law enforcement officer. He estimated in his deposition that he has made approximately 100 DUI arrests over the course of his career. While he was on the scene of the accident and before any SPD officers arrived, he spoke briefly with Plaintiff. Clark perceived that Plaintiff was acting in a manner he considered to be "somewhat erratic and odd." (Clark Aff. (ECF No. 42-11) at ¶ 9.) Based on his observations of Plaintiff and his past experience, he suspected that Plaintiff was "under the influence of some intoxicant." (*Id.*)

SPD Officer Marcy Gossett began working for the SPD in 1999, after having worked as a police officer at Middle Tennessee State University for three years. Gossett is a Field Training Officer for the SPD. Among other training and continuing education received while employed by the SPD, Gossett attended a DUI training class approximately three to four years prior to her deposition.

Gossett testified that she was notified about a motor vehicle accident on Sam Ridley Parkway at approximately 6:30 in the evening on February 18, 2009. When she arrived on the scene, she saw that a Rutherford County Sheriff's Department vehicle was already present. She also saw Plaintiff's and Abraham's cars pulled onto the inside shoulder of the Parkway, against the median that separated the east- and westbound lanes of traffic, with Plaintiff's in front and Carolynn Abraham's behind it.

After pulling up behind Clark's vehicle, Gossett made contact with Abraham and asked her for her license, registration, and proof of insurance. She then approached Plaintiff's vehicle to request the same

---

[3] Plaintiff seeks to exclude this testimony from consideration on the grounds that Abraham is not qualified to offer an expert opinion. Under Rule 701 of the Federal Rules of Evidence, however, a non-expert witness may offer testimony in the form of opinions or inferences so long as such opinions and inferences are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 72." Abraham's opinions that Plaintiff was "jittery and evasive," that her behavior was "unusual," and that she appeared to be under the influence of drugs all fall within the scope of Rule 701 and are admissible. Abraham personally witnessed Plaintiff's behavior, and her testimony serves to corroborate the police officers' opinions that Plaintiff was acting so strangely that they had probable cause to believe that she was under the influence of intoxicants. Moreover, a lay witness is competent to testify that a person appeared intoxicated or was behaving strangely. Plaintiff's objection to the opinion testimony of Carolynn Abraham is therefore overruled.

documentation from Plaintiff. Plaintiff presented her driver's license and insurance card, but not her registration. Gossett asked her again for her registration. At one point, Gossett pointed out to Plaintiff the registration in a pile of paperwork in Plaintiff's lap, but Plaintiff still did not hand her the registration. Gossett pointed out the paper she needed several times but Plaintiff appeared confused and apparently never handed over the appropriate document.

After Gossett had walked back to her vehicle to run the drivers' licenses and to begin drafting the accident report,[4] Abraham approached her to "inquire[] about Ms. Brown's mental state and sobriety." (Gossett Dep. (ECF No. 42-8) at 37:3–4.) Gossett replied that she would "look into it." (*Id.* 38:1.) Shortly thereafter, Deputy Clark approached Gossett to broach the same topic. Clark recalled that he advised Gossett to ensure that her dashboard video camera in her patrol car was working so that she could record Plaintiff's behavior. (Clark Aff. ¶ 10.) Clark also told Gossett that Plaintiff might be "49," law-enforcement code for suspected DUI. (*Id.*; Gossett Dep. 39:5–6.) At that point, Gossett called for another unit to assist her so that Clark could leave.

Clark did in fact leave, and two other officers arrived, Officers O'Conner and Elstran, neither of whom is named as a defendant in this action. Gossett asked O'Conner to "run the tags" on the two vehicles. Otherwise, his primary role for the remainder of the stop was to keep an eye out for traffic, as they were on a high-traffic road. After Gossett completed her report and permitted Abraham to leave, Gossett asked Elstran to assist her in having Plaintiff perform field sobriety tests. Gossett asked Elstran to perform the tests so that she could observe the results more closely than if she were conducting them herself. (Gossett Dep. 44:19–20.) Gossett testified that she felt field sobriety tests were warranted because of the Deputy Sheriff's initial concern; because of Plaintiff's apparent confusion upon being asked to produce her registration and other documentation; because Gossett had observed Plaintiff stumble upon exiting her vehicle and walk unsteadily; and because she found it unusual that Plaintiff was

---

[4] Gossett admittedly had some information that Plaintiff was being investigated by Detective Nabours before the February 18, 2009 accident. She testified that she recognized Plaintiff's name when she ran the driver's license, and the videotape of the stop indicates that when Gossett called for back-up, she made some reference to Plaintiff being a person who had caused trouble in the past. However, Gossett also testified that that information did not have any effect on her opinion of Plaintiff or her decisionmaking process during the stop. Moreover, as discussed below, the question of whether the decision to arrest Plaintiff for DUI is essentially an objective one: whether a prudent officer under the circumstances had a reasonable basis for believing she had probable cause to make the arrest.

continuously eating from a large bag of Chex Mix while interacting with police officers. (Gossett Dep. 45:1–4). Gossett stated that, for all these reasons, she believed she had reasonable basis for asking Plaintiff to perform field sobriety tests. Plaintiff, however, asserts that she never stumbled upon exiting her vehicle and was not unsteady on her feet after exiting her vehicle. (Brown Aff. (ECF No. 47-4) at ¶ 15.) The Court accepts as true for purposes of this motion that Plaintiff did not stumble upon exiting the vehicle. Regardless, the record is also clear that Plaintiff gave consent to perform the field sobriety tests.

Eric Elstran is a detective with the Smyrna Police Department. On February 18, 2009, Elstran was working for the SPD as a Field Training Officer. Prior to that evening, Elstran had never heard of or had any involvement with Dr. Joyce Brown. Elstran testified that, on that evening, Officer Marcy Gossett called him on his cell phone. Elstran was at home at the time. During the telephone call, Gossett told Elstran she had a person who was possibly impaired, and she asked Elstran to come out and help her conduct field sobriety tests. Elstran arrived on the scene approximately five minutes after speaking with Gossett on the phone.[5]

Upon his arrival, Elstran observed two cars that appeared to have been involved in a minor traffic accident, and two police vehicles. When Elstran approached Gossett, Gossett told him again that there were some concerns that Dr. Brown might be impaired and she (Gossett) wanted Elstran to perform some field sobriety tests. Elstran walked up to Plaintiff's vehicle and asked her to "walk back directly to the front of Officer Gossett's vehicle." (Elstran Dep. (ECF No. 42-9) at 9:18–19.) His purpose for giving such a specific directive was to gauge how Plaintiff reacted to instructions. (Elstran Dep. 10:1–3.) Elstran himself moved directly to the front of Gossett's vehicle. Plaintiff responded by walking parallel to the road until she came up to the side of Gossett's car. (Elstran Dep. 10:23–24.) Elstran asked her to come up to the front of the vehicle where he was standing, and she did so. The videotape of the stop clearly shows that Plaintiff stumbled and appeared unsteady as she stepped up to the front of Gossett's vehicle. Plaintiff was eating also Chex Mix from a large bag by the handful, which struck Elstran as "unusual." (Elstran Dep. 10:25.) Upon Elstran's request, she placed the large bag on the hood of Gossett's vehicle, and eventually, with some difficulty, stashed a smaller bag into one of her pants pockets.

---

[5] Elstran recalled that Gossett informed him at some point, whether on the phone during the initial call or later, that "narcotics was looking at [Plaintiff] as part of an investigation." (Elstran Dep. 7:9–11.)

Elstran explained to Plaintiff that there was "concern" and asked if she would be willing to attempt some field sobriety tests; Plaintiff admits she agreed to do so. The first test or task that Elstran went over with Plaintiff was "the finger count." (Elstran Dep. 11:10.) While Elstran was giving the instructions to Plaintiff regarding how to do it, she started doing the test, "without any obvious signs of impairment," according to Elstran. (Elstran Dep. 11:14–15.)

The second test Elstran asked Plaintiff to perform was a one-legged stand. As part of his explanation of the one-legged stand test, Elstran demonstrated standing on one leg with his hands to his side and explained that Plaintiff should stand on one leg and begin counting out loud by the thousands (1000, 2000, 3000, etc.) until he asked her to stop. Plaintiff began performing the task by lifting up one leg, but she did not count. When she eventually started counting, she did not follow Elstran's instructions to count by thousands, and instead began counting "one, two, three, four, five." (Elstran Dep. 11:25–12:3.) Plaintiff also held her arms out to the side, instead of straight down, in what appeared to Elstran to be an attempt to maintain balance.

The third test Elstran demonstrated was the finger-to-nose task, which Elstran asked Plaintiff to perform first with her left hand. Plaintiff performed this task without difficulty, though she did it twice despite being asked to do it only once. Plaintiff was also asked to perform the task with her right hand. When Plaintiff attempted to perform the test with her right hand, she first put the tip of her index finger to her upper lip and then moved it to the tip of her nose.

Elstran then had Plaintiff perform a test that required walking nine steps heel to toe, on a line, and then turning, before taking nine heel-to-toe steps back the other direction. According to Elstran, he asked Plaintiff to stand with her feet in a line, with the toes of one foot touching the heels of the other, while he explained and demonstrated the task. He testified at his deposition that he always does this "as part of the task to see if they can maintain that position. Dr. Brown could not." (Elstran Dep. 13:13–15.) The task itself requires taking nine steps, heel to toe, on the painted line on the side of the road, performing "a specific kind of turn" which Elstran demonstrated, and then taking nine steps back. (Elstran Dep. 13:17–18.) According to Elstran, Plaintiff's heel-to-toe steps were not "fluid" and she did not keep her arms down by her side. (Elstran Dep. 13:22, 24.) Instead, she held her arms out to the side for balance and, according to Elstran, she appeared "wobbly." (Elstran Dep. 13:25–14:1.) Her turn was not the same as

that demonstrated by Elstran, and she took ten steps back instead of nine. The videotape of the stop substantiates Elstran's testimony.

Following the completion of the nine-step test, Elstran asked Plaintiff to step to the side while he conferred with Gossett. At that time, Elstran told Gossett that, based on his observations of Plaintiff's behavior and performance of the tasks, he believed Plaintiff was obviously impaired and that there was probable cause to arrest her for driving under the influence. (Elstran Dep. 14:7–11.) The videotape documents that Gossett and Elstran discussed Plaintiff's performance on the field sobriety tests; they agreed that alcohol was not the issue but both were concerned that Plaintiff appeared to be under the influence of some kind of drug. Elstran expressed the opinion that Gossett had probable cause to arrest for DUI and stated, at one point, "Well, whatever, we can't let her drive." Gossett agreed. Elstran also testified that he believed that he and Gossett would have been negligent to permit a person who performed as poorly on the field sobriety tests as Plaintiff did to get back into a vehicle and drive away from the scene. Gossett testified that after Plaintiff had performed the nine-step-and-turn test, she too "felt there was reason to believe that [Plaintiff] was impaired." (Gossett Dep. 65:23–24.)

At her deposition, Gossett testified that she recalled learning at the DUI training session she attended about the different field sobriety tests, "how to demonstrate them so that people understand what you're asking of them, how to determine whether or not that task is successful, court preparation." (Gossett Dep. 5:13–16.) She also stated that one of the clues of possible impairment she looks for, besides poor balance, is how a driver responds to being given a "divided attention" task, such as being asked to respond to a question by the police officer while also being required to produce a driver's license and registration. (Gossett Dep. 25:20–27:12.) According to Gossett, confusion or inability to concentrate on two tasks at once is a sign that the person might be impaired. Other signs include such things as wobbling or raising the arms to stay balanced during a one-legged stand or heel-to-toe walk, or stepping off the line while doing the heel-to-toe walk. Gossett observed Plaintiff interrupt Elstran while he was providing instructions on some of the tests, and saw that Plaintiff's balance appeared to be unsteady, and that Plaintiff did not precisely follow Elstran's instructions on some of the tests. Gossett also testified that Plaintiff's over-all performance on the field-sobriety tests, "on top of the confusion in her vehicle, the opinion of the Rutherford County Deputy – all of that combined," led her to the conclusion that Plaintiff

was probably impaired. (Gossett Dep. 66:4–7.)

After Elstran and Gossett had discussed the matter, Gossett arrested Plaintiff for suspicion of DUI. (Gossett Dep. 66:12–13.) Plaintiff was placed in the back of Gossett's patrol car, hand-cuffed with her hands in front of her, and was allowed to make several telephone calls to try to have someone come get her vehicle. Gossett read the Implied Consent Form pertaining to the submission of blood for test results, and Plaintiff gave her consent. Elstran and Gossett together transported Plaintiff to Stonecrest Medical Center Emergency Department in order to have Plaintiff's blood drawn and tested for drugs and alcohol. Gossett then escorted Plaintiff to the SPD for booking. After Gossett returned to the police department, she filled out a probable-cause warrant and then contacted Commissioner Gutierrez, who issued the warrant. He also set the bond. Plaintiff paid a bondsman a percentage of the bond and was released. Gossett testified that she completed her report and thereafter swore out a DUI complaint against Plaintiff.

It is undisputed that the blood test administered to Plaintiff came back negative for scheduled narcotics and alcohol. Gossett testified that after receiving the results of the blood test, which took several weeks, she did not inquire about the status of Plaintiff's prosecution, other than to call the district attorney's office to verify whether she needed to do anything else since the test results were negative. She had no further involvement in the prosecution of Plaintiff for driving under the influence. (Gossett Dep. 82:11–19.) In other words, other than arresting Plaintiff and swearing out a DUI complaint, she took no active role in the prosecution of Plaintiff. (Gossett Dep. 82:23–83:1.) Plaintiff attempts to dispute this allegation with reference to her own testimony to the effect that she was required to hire "multiple" lawyers and appear in court multiple times before she succeeded in having the charges dismissed. (Brown Aff. ¶ 18.) Plaintiff, however, is unable to implicate Gossett or any other defendant as having any role in the alleged continued prosecution of the charge.

Plaintiff prescribes the medication Detrol to herself. She acknowledged during her deposition that dizziness and blurred vision are possible side-effects of the medication, and that she had taken one Detrol within the 24-hour period prior to the accident. At the time of her arrest, she had among her possessions her Detrol medication as well as some other pills, which she testified were nutritional supplements. Plaintiff has submitted an affidavit asserting that she was agitated and scared as a result of

having been rear-ended on a busy street, and she was hungry and tired after having been at work since early that morning. In addition, it was dark when the accident occurred, and the road remained busy with heavy, fast-moving traffic throughout the stop. Plaintiff was also frustrated that the police were focusing their attention on her instead of on the person who caused the accident.

### B.     The Criminal Investigation

Defendant Allan Nabours has worked for the Smyrna Police Department since March 1, 1999. He worked initially as a Field Training Officer, and was promoted to the position of Detective in August 2007. As a police officer with the SPD, he has received at least forty hours per year of in-service continuing education and training.

Nabours testified that the SPD "started getting complaints" about Plaintiff's prescribing practices around October 2008. (Nabours Dep. (ECF No. 42-10) at 9:25.) These included a complaint from a man about the amount of medication Plaintiff was prescribing to his wife, and at least two anonymous complaints that Plaintiff was overprescribing and some of her patients were selling their pills. (Nabours Dep. 10:10–11.) Nabours was also aware of information obtained during the execution of a search warrant by other SPD officers (including defendants Kevin Krieb and John Liehr) at the residence of Amber Bowers in October 2008, when Nabours was out of town. During the search authorized by the warrant, police officers found "numerous amounts of narcotics" (Nabours Dep. 79:25) apparently prescribed by Plaintiff, and also obtained information regarding Brown's prescribing practices from persons on the premises at the time of the search.

However, the "actual complaint" that prompted a formal investigation was one Nabours received in late November 2008 from a woman whose son had overdosed on pills prescribed by Plaintiff, and died as a result. (Nabours Dep. 10:12.) After Nabours received that complaint, he contacted Rhonda Phillips with DEA Diversion in Nashville and requested a meeting to discuss the "situation." (Nabours Dep. 70:2.) A meeting took place on December 4, 2008 among law enforcement officers with the SPD and the DEA to discuss issues related to Plaintiff's prescribing practices. At the meeting, based on the information presented by the SPD, a DEA representative indicated that the DEA was interested in pursuing an investigation of Plaintiff. Shortly after the meeting concluded, the DEA opened its own investigation. Thereafter, all of Nabours' actions and those of other SPD officers who had any involvement in the

investigation, including defendants Kevin Krieb and John Liehr, were undertaken at the direction of the DEA. These actions included physical surveillance of Plaintiff's office, one or two attempts by undercover agents to obtain prescriptions from Plaintiff, and the execution of a search warrant at her place of business. In addition, Nabours testified that in the course of his investigation of the prescribing practices of another physician, several pharmacy employees at three different local pharmacies volunteered statements to him to the effect that he should be investigating Plaintiff instead. Nabours replied to each of them that the DEA was conducting an investigation into Plaintiff's practices and that they should contact the DEA if they had questions or concerns.

Plaintiff alleged in her Complaint that on or about March 10, 2009, "one of Plaintiff's patients was detained by the Smyrna police," and that while detained he was approached by "Defendants" in an "intimidating manner," and asked "many questions regarding prescriptions written by Plaintiff," and was told "Plaintiff was engaged in illegal and criminal activity." (Compl. (ECF No. 1) ¶ 23.) When asked whether she could elaborate about any part of the allegation contained in Paragraph 23 of the Complaint, Plaintiff stated, "I cannot speak to that at this time." (Brown Dep. (ECF No. 42-7) at 225:5.)

She likewise alleged in the Complaint that "Defendants" advised CVS Pharmacy that Dr. Brown was being investigated and that CVS should not fill any prescriptions written by Brown. When asked which defendant or defendants she intended to reference in that paragraph, Plaintiff responded, "I cannot speak to that at this time." (Brown Dep. 226:13.)

Similarly, when asked about other allegations in her Complaint regarding patients whose prescriptions were not filled because "law enforcement" had instructed the pharmacy not to fill prescriptions written by Plaintiff, and about a van and unmarked police car conducting surveillance on Plaintiff's office, Plaintiff repeated the mantra, "I cannot speak to that at this time." (Brown Dep. 226:18; 227:1, 6, 8, 11, 15, 21; 228:8, 11, 14, 17; 229:21.)

In response to frustrated questioning from defense counsel regarding whether she understood that her deposition was the defendants' attorney's only opportunity to ask her questions about what facts she believed supported her claims, Plaintiff again repeated "I cannot speak to that at this time." (Brown Dep. 230:12, 16, 20.) Defense counsel asked twice whether she could speak at all about the allegations in the Complaint, and Plaintiff averred that she could not:

Q.  You bring this lawsuit, and you can't tell us any facts, any information, any evidence that you based these claims on?

Mr. Woods:  Object to form.

A.  I cannot speak to that at this time.

(Brown Dep. 230:4–8.)

Q.  And as you sit here today, you really can't tell us anything about any of the information that you have in this document [the Complaint], can you?

A.  I cannot speak to that at this time, sir.

(Brown Dep. 230:21–24.)

Asked which of the defendants had done anything to affect Plaintiff's business relationship with any pharmacy, Plaintiff responded, "I cannot recall at this time."  (Brown Dep. 233:8.)  She likewise could not recall whether any of the Named Defendants had been into any of the pharmacies where her patients filled prescriptions.  She similarly could not state any facts to support her claim of a civil conspiracy among Defendants to harm or damage her.  (Brown Dep. 234:1–7.)[6]

**C.**   **Service of the Complaint and Summons**

Plaintiff filed her Verified Complaint in this action on October 2, 2009, and had four summonses issued, one for each of the Named Defendants, on the same day.

As previously stated, the Named Defendants are all law enforcement officers employed by the Town of Smyrna, Tennessee.  The Named Defendants were all still employed by the Town of Smyrna in October 2009.  Mark O'Neal is the Manager for the Town of Smyrna.  O'Neal has likewise been continuously employed by the Town of Smyrna at all times relevant to this dispute.

Each of the four summonses issued on October 2, 2009 states the Plaintiff's name and one of the defendant's names in the section at the top of the first page where the title or style of the case is to be set

---

[6] In her response to Defendants' statement of undisputed facts referencing these portions of Plaintiff's deposition, Plaintiff attempts to dispute that she repeatedly responded, "I cannot speak to that at this time."  The basis for her attempt to create a disputed fact as to this response is that on the beginning of the second day of her deposition, prior to the colloquies related herein, Plaintiff apologized for not being able to comment about certain statements made by other witnesses during the first day of her deposition, and encouraged defense counsel to ask her about those statements again, but defense counsel never asked her again about those particular statements.  (Brown Dep. at 135:17–20.)  That exchange, which took place at roughly 9:00 a.m. the morning of the second day of her deposition, obviously has no bearing on Plaintiff's subsequent non-responsive responses to questions asked later that same day.

out.  Below the case style appears the heading:  "Summons in a Civil Action," and below that heading appear the words:  "To:  (*Defendant's name and address*)," followed by a blank space.  In that blank space, Plaintiff or her attorney typed in the name and address of the Town Manager, rather than the name of any of the individual defendants.  For example, the summons issued for defendant Kevin Krieb looks something like this:

UNITED STATES DISTRICT COURT
for the
Middle District of Tennessee

| | | |
|---|---|---|
| <u>     Dr. Joyce Brown          </u>   ) | | |
| *Plaintiff*  ) | | |
| v.  ) | Civil Action No.  3 09 0927 | |
| <u>Kevin Krieb               </u>   ) | | |
| *Defendant*  ) | | |

To:  (*Defendant's name and address*)   c/o Mark O'Neal, Town Manager City of Smyrna
315 South Lowery
Smyrna, Tennessee 37176

A lawsuit has been filed against you.

Within 20 days after service of this summons on you . . . you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Allen Woods
PO Box 128498
Nashville, TN 37212

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

(ECF No. 3, at 1.)  The document is stamped with the date October 2, 2009, and signed by the Deputy Clerk of Court.  Page 2 of the Summons is the "Proof of Service."  This form was signed and dated by Jennifer Pitta, who was acting as process server for Plaintiff's attorney, on October 6, 2009 and reads in pertinent part above her signature as follows:

This summons for *(name of individual and title, if any)*  <u>  Mark O'Neal Town Manger City of Smyrna  </u> was received by me on *(date)*  <u>  10/6/09   </u>.

I personally served the summons on the individual at *(place)*  <u>  Town of Smyrna Administrative  </u> on *(date)*  <u>  10/6/09   </u>.

(ECF No. 3, at 2.)  Each of the other three summonses served on the remaining three Named Defendants is identical except that the pertinent individual's name appears under the case style above the heading

"Summons in a Civil Action."  (ECF No. 3, at 3, 5, 7.)

On October 6, 2009, Mark O'Neal was not in the Smyrna Town offices in Smyrna, Tennessee. Instead, he was in Gatlinburg, Tennessee.  According to O'Neal, he has never been authorized to accept service of process for any employee of the Town of Smyrna.  Further, each of the Named Defendants attests that they never authorized O'Neal or anyone else to accept service of process on their behalf. There is no dispute that Plaintiff did not personally serve any of the Named Defendants with a summons and copy of the Complaint, nor did she leave or serve a summons or copy of the Complaint at the residence of any of the Named Defendants.

Plaintiff contends, however, that Town Manager Mark O'Neal had "apparent authority" to accept service of process on behalf of the Named Defendants.  In support of that assertion, Plaintiff relies on the affidavit of her attorney, Allen Woods, who attests therein that he was told via telephone by some unnamed person at the Smyrna Police Department that the Named Defendants could be served care of Mark O'Neal, Smyrna Town Manager, at 315 South Lowery, Smyrna, Tennessee 37167.  Mr. Woods attests that, based on that information, he reasonably believed that the Named Defendants could be served care of Mark O'Neal.  The Court notes that Defendants object to Mr. Woods' affidavit testimony regarding what some unnamed person at the Smyrna Police Department allegedly told him on the telephone as inadmissible hearsay.  The Court finds, however, that the statement is not offered for the truth of the matter asserted and is therefore not hearsay.  Rather, it is offered in support of the purported reasonableness of Mr. Woods' belief that it was appropriate to serve the Named Defendants care of Mark O'Neal.  The Court will therefore consider Mr. Woods' testimony in ruling on the Defendants' motions.

## II.     ANALYSIS AND DISCUSSION – MOTIONS TO DISMISS

### A.     The Rule 12(b)(6) Motions to Dismiss Claims against John Doe Defendants and against Named Defendants in their Official Capacity

In her response to Defendants' motion, Plaintiff concedes that the claims against the John Doe defendants, who have never been served, may be dismissed, and that she only intends to pursue the causes of action stated in the Complaint against the Named Defendants.  The motion to dismiss the claims against the John Doe defendants will therefore be granted.

In addition, Plaintiff purported to bring this action against the Named Defendants in both their official capacity and their individual capacity.  As stated above, Defendants are all law enforcement

officers employed by the Town of Smyrna. A suit against a government employee in his official capacity is equivalent to suit against the governmental entity itself. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 63–64 (1989). Thus, Plaintiff's claims against the Named Defendants in their official capacity must be construed as a claim against the Town of Smyrna. Plaintiff acknowledges in her response to the Defendants' motions that she cannot prove and does not intend to pursue any claims against the Town of Smyrna or against Defendants in their official capacity. The motion to dismiss the claims asserted against the Named Defendants in their official capacity will therefore also be granted without further discussion.

### B. The Motion to Dismiss Based on Insufficient Process or Insufficient Service of Process

Defendants seek dismissal of the action altogether under Rule 12(b)(4) and 12(b)(5) of the Federal Rules of Civil Procedure, which concern insufficiency of process and insufficiency of service of process, respectively. An objection under Rule 12(b)(4) concerns the *form* of the process rather than the manner or method of its service, while an objection under Rule 12(b)(5) challenges the mode of delivery or the lack of delivery of the summons and complaint. 5B Wright & Miller, *Federal Practice and Procedure: Civil 3d* (hereafter, "Wright & Miller") § 1353 (noting that "a motion under Rule 12(b)(4) is fairly rare").

In this case, both the form of the summons and the manner of service are plagued with errors. With respect to the form of the summons, it is apparent that each summons was filled out incorrectly insofar as the complete case name was not identified at the top of the summons, in violation of Rule 4(a)(1)(A), and the summons was not "directed to the defendant" upon whom it was to be served, in violation of Rule 4(a)(1)(B). Further, as a result of these errors, it appears the process server mistakenly believed she was serving each summons on Mark O'Neal himself, which likely led to the administrator's acceptance of process on behalf of Mark O'Neal.

With regard to service of process, Rule 4(e) requires that service upon an individual be made by delivering a copy of the summons and complaint upon the defendant personally; by leaving a copy at the defendant's residence "with someone of suitable age and discretion who resides there"; or by "delivering a copy of each to an agent authorized by appointment or by law to receive service of process." There is no dispute that Defendants were not served personally, nor were they served by means of delivery of a copy of the summons and complaint to their residence. The question is whether they were appropriately

served by "delivering a copy to an agent authorized by appointment or by law to receive service of process."

Plaintiff's counsel insists, via affidavit, that he spoke with some unidentified person on the telephone at the Smyrna Police Department who informed him that Mark O'Neal would accept service of process for the individual police officer defendants. Regardless of whether Mark O'Neal might have been authorized to accept service of process on behalf of the Named Defendants in their *official* capacity, which is doubtful,[7] there is no competent evidence in the record suggesting he was authorized to accept service of process on behalf of the Named Defendants in their *individual* capacity. Under Tennessee law as elsewhere, implied authority must be predicated on some act or acquiescence by the *principal*, rather than actions of an agent. *Hall v. Haynes*, 319 S.W.3d 564, 573 (Tenn. 2010) (citations omitted). Here, Plaintiff's attorney relied on the actions of neither the principals nor even an agent. It is axiomatic that the actions of an unidentified third party are not sufficient to bind the principal. Plaintiff has not pointed to any action by the Defendants giving rise to apparent agency. Moreover, all the Defendants have submitted affidavits attesting that they did not authorize Mark O'Neal or anyone in his office to accept service of process on their behalf. Plaintiff has not created a genuine dispute of fact as to that issue.

In short, it is clear that process and service of process upon the Named Defendants in their individual capacity was insufficient. Rules 12(b)(4) and (5) enable a defendant to file a motion to dismiss for a plaintiff's failure to effect service of process. The dismissal motion could also be regarded as a motion to quash service. Where service is ineffective, a court has discretion either to dismiss the action

---

[7] This issue of service of process upon Defendants in their official capacity is now immaterial since Plaintiff has conceded her official-capacity claims. The Court nonetheless notes that a suit against a government employee in his official capacity is tantamount to a suit against the government entity itself, and under Rule 4(j)(2) service upon a local government is to be made either by "delivering a copy of the summons and of the complaint to [the government entity's] chief executive officer" or in any other manner prescribed by state law. Under Tennessee law, service upon a municipality may be effected by delivering a copy of the summons and complaint to the municipality's chief executive officer (*i.e.*, the mayor) or to the city attorney. Tenn. R. Civ. P. 4.04(8). Further, *personal* service on either the mayor or the city attorney is required in order for service of process to be sufficient under the Tennessee rules. *See, e.g.*, *Barger v. City of Huntsville*, 63 S.W.3d 397, 399 (Tenn. Ct. App. 2001) (affirming dismissal of two separate actions against the City of Huntsville based on insufficiency of service of process based on the unambiguous language of Rule 4.04(8), where copies of the summonses and complaints were left with the city recorder in the mayor's office rather than served personally upon the mayor). Plaintiff here did not serve Smyrna's mayor or the city attorney, nor has she offered any evidence that the Town Manager, or an administrative assistant in his office, was authorized by law to accept service of process on behalf of the mayor or the city attorney. In other words, it appears service upon the Town Manager was not effective to serve the individual defendants in their official capacity, much less in their individual capacity.

or quash service and retain the case. *Haley v. Simmons*, 529 F.2d 78, 79 (8th Cir.1976). Federal courts, however, unlike the Tennessee state courts, construe the provisions of Rule 4 liberally in order to uphold service, requiring only "substantial compliance." *Jackson v. Hayakawa*, 682 F.2d 1344, 1347 (9th Cir. 1982). In exercising its discretion under Rule 4, a court may consider whether the plaintiff's error resulted from innocent mistake or inexcusable neglect. *Gianna Enters. v. Miss World (Jersey) Ltd.*, 551 F. Supp. 1348, 1359 (S.D.N.Y. 1982). In addition, "defective service is not grounds for dismissal absent some showing of prejudice." *Kemp v. Metabolife Int'l, Inc.*, No. Civ. A. 00-3513, 2003 WL 1936381, at *1 (E.D. La. April 23, 2003) (quoting *Rose v. Koch*, 465 F. Supp. 1157, 1159 (E.D.N.Y. 1979) (citing 5 *Wright & Miller* §§ 1353, 1354)); *Crane v. Battelle*, 127 F.R.D. 174, 177–78 (S.D. Cal. 1989) (denying defendant's motion to quash service under Rule 12(b)(5), based on the finding that the plaintiff was in substantial compliance with Rule 4; his mistake regarding the manner of service was innocent rather than the result of inexcusable neglect; and the defendant was not prejudiced by the plaintiff's error but received sufficient notice of the action against him); *Hawkins v. Dep't of Mental Health*, 89 F.R.D. 127 (D. Mich. 1981) (holding that where defendants were not materially prejudiced in any way, and where plaintiff's service of process had accomplished its intended function in that it actually afforded the defendants notice of pendency of action against them, a quashing of service of process either on grounds of failure to furnish defendant with adequate process or failure to furnish defendant with sufficient service of process would cause unjust delay of proceeding).

Based on these precedents, the Court will exercise its discretion not to dismiss or quash service on the basis of insufficiency of either process or service. The Named Defendants have not been prejudiced by the technical deficiencies in the process or service thereof. The record reflects, in fact, that, they all received service and had hired an attorney within one day after Plaintiff's process server delivered the complaints and summonses to the office of Mark O'Neal. (*See* ECF No. 5, at 1 (in Motion for Extension to Respond to Complaint, Defendants' counsel noted that he was "first contacted and asked to represent the named defendants on October 7, 2009," where the complaints were delivered to Mark O'Neal's office on October 6).)

In addition, Defendants waited until eighteen months after institution of this matter, and the conclusion of lengthy discovery, before filing their motion in conjunction with a motion for summary

judgment on the merits. At this point, dismissing the action, or even simply quashing service and requiring the Plaintiff to re-serve the Complaint (upon Defendants' attorney), would serve no useful purpose and would instead needlessly burden the parties with additional expense and delay, and postpone adjudication of this matter on its merits.

The Court is fully aware that Defendants preserved their objection to process and to service thereof in their answers to the Complaint and again in their discovery responses, and that Plaintiff, though aware of the objections, failed to make any effort to ascertain the validity of the objections or to correct the patent errors. Notwithstanding, the motion to dismiss based on insufficient process and insufficient service of process will be denied on the basis of lack of prejudice, and the Court will consider the merits of the Named Defendants' motions.

## III.    ANALYSIS AND DISCUSSION – MOTIONS FOR SUMMARY JUDGMENT

### A.    Standard of Review

Under Rule 56(a), before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The rule requires the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

**B.     The Federal Claims under § 1983 and the Analogous State-Law Claims**

In the Complaint, Plaintiff states causes of action against the Named Defendants (without, for the most part, distinguishing among them, though it is clear they all played very different roles in the events giving rise to this litigation), under 42 U.S.C. § 1983, for violation of her Fourth and Fourteenth Amendment rights.   The Court construes the Complaint as stating claims under § 1983 for unlawful arrest, malicious prosecution, and malicious abuse of process in violation of the Fourth Amendment. Plaintiff also asserts state-law tort claims for false arrest, malicious prosecution, and malicious abuse of process.   Because the claims are analogous, the Court considers the state torts in tandem with their federal constitutional counterparts.

### *1.     Unlawful Arrest Claim under 42 U.S.C. § 1983 and State Law*

If an individual alleges a violation of the Fourth Amendment for an arrest without probable cause, she may seek recourse under 42 U.S.C. § 1983.   "In order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002), *cert. denied*, 537 U.S. 1191 (2003).   The Sixth Circuit has stated that when a lack of probable cause is the underlying issue in a § 1983 claim, "the question of whether probable cause existed is left for the jury, unless there is only one reasonable determination possible." *Crockett v. Cumberland Coll.*, 316 F.3d 571, 581 (6th Cir. 2003); *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995).

Under Tennessee law, "[t]o recover under the tort of false arrest and imprisonment, a plaintiff must prove: '(1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint.'"   *Crowe v. Bradley Equip. Rentals & Sales, Inc.*, No. E2008-02744-COA-R3-CV, 2010 WL 1241550, at *6 (Tenn. Ct. App. March 31, 2010) (quoting *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990)).

Plaintiff's unlawful arrest/detention claim here does not appear to be predicated upon Gossett's decision to administer the field sobriety tests, and she concedes in her response to the Defendants' statement of undisputed facts that she gave her consent to the field sobriety tests.   To the extent it is, under Tennessee and federal law, police officers are authorized to require a driver to undergo field sobriety tests so long as there is a reasonable, articulable basis for suspecting that the plaintiff had been driving under the influence.   *United States v. Ellis*, 497 F.3d 606, 612–13 (6th Cir. 2007); *State v.*

*Hanning,* 296 S.W.3d 44, 49 (Tenn. 2009). In the present case, Gossett had a reasonable, articulable basis for her suspicion that Plaintiff might be impaired, based on Plaintiff's confusion in responding to Gossett's request that she produce documents; her bizarre behavior, including eating while police officers were addressing her, and both Carolynn Abraham's and Officer Clark's opinions that Plaintiff was behaving strangely and appeared to be under the influence of some kind of intoxicant.

Turning to the arrest itself, a police officer is authorized by Tennessee statute to make a warrantless arrest "[a]t the scene of a traffic accident when, based on personal investigation, the officer has probable cause . . . to believe that the driver of the vehicle has committed an offense under [Tenn. Code Ann.] § 55-10-401." Tenn. Code Ann. § 40-7-103(a)(6). Under § 55-10-401,

> It is unlawful for any person to drive or to be in physical control of any automobile . . . on any of the public roads and highways of the state . . . while . . . [u]nder the influence of any intoxicant, marijuana, controlled substance, drug, substance affecting the central nervous system or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of himself which he would otherwise possess. . . .

Tenn. Code Ann. § 55-10-401(1).

Further, under Tennessee law, probable cause exists if "the facts and circumstances within the officer's knowledge at the time of the arrest, and of which the officer 'had reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" *State v. Henning*, 975 S.W.2d 290, 300 (Tenn. 1998) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). All of the information in the officer's possession, fair inferences therefrom, and personal observations, including past experience, are generally pertinent to determine if an officer has probable cause to arrest. *Greer v. State*, 443 S.W.2d 681, 684 (Tenn. Ct. App. 1969).

The Tennessee standard is grounded in federal precedent from both the Supreme Court and the Sixth Circuit. As the Supreme Court has explained, "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Draper v. United States*, 358 U.S. 307, 313 (1959) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949); *cf. Crockett v. Cumberland College*, 316 F.3d 571 (6th Cir. 2003) ("The probability of criminal activity is assessed under a reasonableness standard based on an examination of all facts and circumstances within an officer's knowledge at the time of an arrest." (internal quotation marks and citation omitted));

*Painter v. Robinson*, 185 F.3d 557, 569 (6th Cir. 1999) ("'Probable cause' denotes 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.' " (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979))).

"Once an officer establishes probable cause, he or she is under no obligation to continue investigating and may instead pursue the arrest of a suspect." *Crockett*, 316 F.3d at 581. Thus, the review of whether probable cause sufficient to make a lawful arrest existed is limited to those factual circumstances known to the officer at the time of the arrest. This review of the totality of the circumstances, however, includes all facts known to the officer at the time, both inculpatory and exculpatory. *See Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) ("[I]n obtaining such reliable information, an officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence. Rather, the officer must consider the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence, before determining if he has probable cause to make an arrest.").

The facts as developed through discovery indicate that Officer Marcy Gossett alone was responsible for the decision to arrest Plaintiff, and that the other defendants had no role whatsoever in the incidents leading up to Plaintiff's DUI arrest. The facts known to Gossett at the time she made the decision to arrest Plaintiff for driving under the influence of some kind of intoxicant included (1) Carolynn Abraham's and the Rutherford County Deputy Sheriff's expressions of concern that Plaintiff was behaving strangely and might be under the influence of drugs; (2) Plaintiff's confusion upon being requested to produce her driver's license, proof of insurance, and registration; (3) Plaintiff's bizarre behavior, specifically including the fact that she was continuously eating from a large bag of Chex Mix throughout her interaction with the law enforcement officers, until she was asked by Elstran to put the bag down; (4) her overall performance on the field sobriety tests, including a failure to follow instructions precisely and difficulties with balance; (5) Officer Elstran's opinion that Plaintiff appeared to be impaired by some type of intoxicant; and (6) Gossett's past experience with intoxicated drivers and training in detecting impaired drivers.[8]

---

[8] The Court has also reviewed the video of the arrest taken by the dash camera installed in Gossett's vehicle (ECF No. 59), and finds that Plaintiff's balance clearly appeared impaired while she was walking back toward Gossett's vehicle and while performing the field sobriety tests.

Plaintiff does not dispute any of these facts. Instead, she attempts to explain her behavior by arguing that (1) her apparent confusion upon being requested to produce documentation arose from her frustration that the police officers were not focusing their attention on Carolynn Abraham, the person admittedly at fault for the traffic accident; (2) she was tired from having worked a very long day; (3) she was eating because she was very hungry; and (4) her balance was impaired because it was dark and the ground was uneven. These factors may indeed explain Plaintiff's behavior, but they do not affect the question of whether Plaintiff's behavior gave rise to probable cause to suspect that Plaintiff was operating a vehicle in violation of Tenn. Code Ann. § 55-10-401(1).

As indicated above, in § 1983 actions raising the question of probable cause, a jury question is presented unless only one determination is reasonably possible. *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001). In considering "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986), based upon the information available to Gossett at the time of the arrest as described above, the Court finds that reasonable minds would not differ on whether Gossett had probable cause to arrest Plaintiff for DUI. In order for the nonmoving party to survive a motion for summary judgment, there must be a *genuine* dispute of a material fact such that a trier of fact could return a verdict for the nonmovant. *Rodgers v. Monumental Life Ins. Co.*, 289 F.3d 442, 448 (6th Cir. 2002). Facts are material for purposes of summary judgment proceedings only if establishment thereof might affect the outcome of the lawsuit under governing substantive law. *Id.* As discussed above, the totality of the facts within Gossett's knowledge, including her past training and experience, supports a probable cause finding. The facts pointed out by Plaintiff as potentially exculpatory, which are accepted as true, do not create a dispute as to any material fact because they fail to suggest that more than one conclusion as to probable cause was reasonably possible.

Defendant Gossett is entitled to summary judgment in her favor as to the unlawful-arrest claim asserted against her under § 1983 and under state law because her decision to arrest was supported by probable cause. The other defendants are entitled to summary judgment as to these claims because it is undisputed that they had no involvement in the arrest or the decision to arrest Plaintiff.

In the alternative, the Court finds that even if probable cause did not exist, Gossett is entitled to

qualified immunity.  The law is clear that state actors are entitled to qualified immunity unless their conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). If "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," then qualified immunity is inapplicable. *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  However, if "officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." *Malley*, 475 U.S. at 341.  In the present case, Gossett's conduct falls well within this range, as reasonable officers could disagree as to whether probable cause existed.  She is therefore entitled to summary judgment on the alternative grounds of qualified immunity, even if probable cause did not exist. *Cf. Meadows v. Thomas,* 117 F. App'x 397, 402 (6th Cir. 2004).

### 2. Malicious Prosecution Claim under 42 U.S.C. § 1983 and State Law

To establish a malicious-prosecution claim under Tennessee law, a claimant must show that:  "(1) a prior suit or judicial proceeding was brought against plaintiff without probable cause, (2) defendant brought such prior action with malice, and (3) the prior action was finally terminated in favor of plaintiff." *Christian v. Lapidus*, 833 S.W.2d 71, 73 (Tenn. 1992) (citing *Lewis v. Allen*, 698 S.W.2d 58, 59 (Tenn. 1985)).  Although the Sixth Circuit has yet to clarify the elements of a malicious-prosecution claim under § 1983, it has recognized that to support such a claim "a plaintiff must show, at a minimum, 'that there was no probable cause to justify [his] arrest and prosecution.'" *Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003) (quoting *Darrah v. City of Oak Park*, 255 F.3d 301, 312 (6th Cir. 2001)).

Because the Court has determined that probable cause existed to support the DUI arrest, the malicious prosecution claim against Gossett also fails as a matter of law.  Moreover, even if that were not the case, there are no facts in the record to support the element of malice.  Gossett testified that after filing her report and swearing out a criminal complaint, she had no further involvement in the prosecution of the DUI case.  After the test results were returned, Gossett Plaintiff contacted the district attorney's office to ask what she "needed to do with the case" since the drug test results were negative.  (Gossett Dep. 84:2–3.)  She was informed that she needed to wait until the case "gets to court in Smyrna and handle it then."  (Gossett Dep. 84:5–6.)  However, Gossett heard nothing more about the matter and took

no further action after that conversation. Plaintiff has not presented any facts that would call Gossett's testimony in that regard into question. Even accepting as true Plaintiff's contention that she was required to hire multiple lawyers and appear in court multiple times before the DUI charge was dropped, she has presented no evidence that Gossett played any role in the decision to prosecute the DUI claim against Plaintiff or to pursue the case once the blood test results came back negative.

With respect to Defendants Nabours, Liehr, and Krieb, although the claims in the Complaint are aimed generally at "Defendants," the facts clearly show that only Officer Gossett was involved in the decision to arrest Plaintiff for DUI, and that Gossett was or, as she testified, "would have been" the prosecuting officer on the case if it had not been dismissed. (Gossett Dep. 7:16.) The facts as developed in discovery do not remotely support a claim for malicious prosecution against any of the other defendants.[9]

Defendant Gossett and the other defendants are entitled to summary judgment in their favor as to the malicious prosecution claim as well.

### 3. Malicious Abuse of Process Claim under 42 U.S.C. § 1983 and State Law

The Sixth Circuit has never specifically determined whether a claim for abuse of process is a cognizable constitutional claim that can be redressed under § 1983. *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 676 (6th Cir. 2006). In *Voyticky*, the Sixth Circuit "again [found] it unnecessary to rule on that question," on the basis that, even if such a claim were cognizable as a federal constitutional claim, "the elements necessary to prove it would likely mirror those of state law." *Id.* Thus, while it is not entirely clear in this case whether Plaintiff intended to state a federal claim for abuse of process, to the extent she did, it will be considered under the same standards applicable to the state-law claim.

The Tennessee Supreme Court has described the tort of abuse of process as involving, not the commencement of an action or causing process to issue without justification, but "misusing, or misapplying process itself for an end other than that which it was designed to accomplish." *Givens v.*

---

[9] Curiously, Plaintiff asserts in the introductory section of her brief that she intends to show that "the harassment and investigation" of her by these defendants were "not based on probable cause." (ECF 46-3, at 3.) In the body of the brief, she argues that Krieb, Liehr, and Nabours are not entitled to qualified immunity for their actions in conducting the criminal investigation of her prescribing practices based on the absence of probable cause. However, nowhere does Plaintiff allege that she has actually been arrested or prosecuted on any charges related to the prescribing of controlled substances. Regardless, the degree of suspicion required to justify an ordinary criminal investigation is necessarily much lower than probable cause.

*Mullikin*, 75 S.W.3d 383, 400 (Tenn. 2002) (internal quotation marks and citations omitted). A plaintiff must establish two elements to prove the tort: "(1) the existence of an ulterior motive; and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge." *Id.* (internal quotation marks and citations omitted).

In the present case, Plaintiff has not alleged the existence of an ulterior motive, other than perhaps implying that Defendants chose to arrest and prosecute her only because of her race, nor has she identified any abusive act in the use of process, much less shown that any of the Named Defendants were involved in the perpetration of such an act. Because Plaintiff has not established the necessary elements of a cause of action for abuse of process, under state or federal law, Defendants are entitled to summary judgment as to that claim too.

### C. The Remaining State-Law Claims

#### 1. Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress ("IIED") under Tennessee law, (1) the conduct complained of must be intentional or reckless; (2) the conduct complained of must be so outrageous that it is not tolerated in civil society; and (3) the conduct complained of must result in serious mental injury. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). Regarding the type of conduct that will satisfy the second element, the Tennessee Supreme Court has adopted the following language from the Restatement (Second) of Torts:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous."

*Bain*, 936 S.W.2d at 623 (quoting *Medlin v. Allied Inv. Co.*, 398 S.W.2d 270, 274 (1966), and Restatement (2d) Torts § 46(1)). *Cf. Dunn v. Moto Photo, Inc.*, 828 S.W.2d 747, 754 (Tenn. Ct. App. 1991) (holding that the plaintiff stated an IIED claim where photo store employee deceived plaintiff by representing that her film could not be developed, when the film had been developed and at least one print had been produced; and the employee fraudulently retained the print for his own base purposes, that is, to display it

to "friends" who desired to see a "wild picture" and then lending the print to a friend, who was also an acquaintance of the plaintiff, for the declared purpose of "having some fun" at the expense of plaintiff); *Dunbar v. Strimas*, 632 S.W.2d 558, 560–61 (Tenn. Ct. App. 1981) (IIED claim stated where mother, who defendant had been told was of fragile mental health, was erroneously informed that her nineteen-month-old daughter's death was the result of sexual assault and suffocation); *Johnson v. Woman's Hosp.*, 527 S.W.2d 133 (Tenn. Ct. App. 1975) (IIED claim stated where the hospital breached its contract to bury a stillborn infant and instead preserved the body in a jar of formaldehyde and displayed same to the plaintiff/mother).

The conduct of which Plaintiff complains in this case does not remotely rise to the level of "outrageousness" that would satisfy this test. In addition, there is no evidence in the record suggesting that Plaintiff has suffered serious mental injury as a result of said conduct. Defendants are also entitled to summary judgment of Plaintiff's claim of intentional infliction of emotional distress.

### 2. State-Law Claim for Tortious Interference with Business Relationships

The tort of interference with business relationships in Tennessee requires that a plaintiff demonstrate:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's *improper motive or improper means*; and finally, (5) damages resulting from the tortuous interference.

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (internal citation and footnotes omitted; emphasis in original). With regard to the requisite improper motive, the Tennessee Supreme Court elaborated:

> It is clear that a determination of whether a defendant acted "improperly" or possessed an "improper" motive is dependent on the particular facts and circumstances of a given case, and as a result, a precise, all-encompassing definition of the term "improper" is neither possible nor helpful. However, with regard to improper motive, we require that the plaintiff demonstrate that the defendant's predominant purpose was to injure the plaintiff.
>
> Moreover, in the attempt to provide further guidance, we cite the following methods as some examples of improper interference: those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules; violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship; and those methods that

> violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition.

*Id.* at 701 n.5.

In response to Defendants' motion for summary judgment as to this claim, Plaintiff states, "[A]t this stage of litigation, Plaintiff need not *prove* her allegations. She has plead them sufficiently in her Complaint." (ECF No. 46-3, at 30 (citing Compl. ¶¶ 68–74).) Although Plaintiff is correct that she need not *prove* her allegations, she must do more than plead them. At this stage of the litigation, she must produce sufficient admissible evidence which, if believed by the jury, would reasonably permit the jury to render a verdict in her favor. In the referenced paragraphs of her Complaint (which is verified, rendering it equivalent to an affidavit in terms of its evidentiary value), Plaintiff states that Defendants intentionally interfered, without justifiable cause or excuse, with existing and lawful relationships with various pharmacies in and around Smyrna at which Plaintiff's patients typically filled their prescriptions, and interfered with Plaintiff's relationships with her patients by intimidating them and telling them that Plaintiff was being investigated. Plaintiff also alleges that Defendants' interference with her relationships with pharmacies and patients "was the result of improper and malicious motives and means," and that Defendants "acted with the intent to damage or breach the relationship Dr. Brown had with the local pharmacies and her patients." (Compl. ¶¶ 71, 73.)

The conclusory allegations in Plaintiff's Complaint regarding Defendants' motives and means are not supported by a single shred of competent, admissible evidence in the record, whether direct or circumstantial. Plaintiff has not attempted to refute Nabours' testimony that the SPD received complaints from community members about Plaintiff's prescribing practices, that the SPD began an initial investigation into those practices but contacted the DEA within weeks of doing so, and that the DEA thereafter took over the investigation. After approximately November 2008, any actions undertaken by the SPD with regard to the investigation into Plaintiff's prescribing practices were done at the request and under the direction of the DEA. Aside from Plaintiff's conclusory and unsupported allegations, which do not qualify as admissible evidence, there is no evidence that any actions taken by Defendants were independently tortious or done for the purpose of injuring Plaintiff. On that basis alone, Defendants are entitled to summary judgment of this claim as well.

### 3.     *Civil Conspiracy Claim*

Plaintiff also asserts a claim of civil conspiracy.  Because she has not presented facts sufficient to prove the underlying tort claims, she necessarily cannot prove the Defendants conspired to engage in those torts.

### 4. Damages Claims

Defendants also seek summary judgment as to Plaintiff's claims for punitive damages and prejudgment interest.  Because all of Plaintiff's substantive claims are subject to dismissal, her damages claims necessarily fall by the wayside as well.

## IV. CONCLUSION

For the reasons set forth herein, Defendants' motion will be granted and the Plaintiff's Complaint dismissed in its entirety.  An appropriate order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge